UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. _

NASHAUN BURRELL, )
)
Plaintiff, )
)
v. )
) **COMPLAINT**
ADVENTURES BY DAWN, LLC d/b/a ) **(Jury Trial Demanded)**
ADVENTURE TOURS, LLC d/b/a )
ADVENTURE BY DAWN NC, a foreign )
corporation, )
)
Defendant. )

NOW COMES Plaintiff Nashaun Burrell by and through undersigned counsel and complains and states against Defendant Adventures By Dawn, LLC, d/b/a Adventure Tours, LLC (d/b/a Adventure By Dawn NC) (hereafter "Defendant" or "Adventure Tours") as follows:

## INTRODUCTION

This action arises from Defendant's failure to prevent and promptly remedy repeated sexual harassment directed at Plaintiff by a coworker despite Defendant's actual knowledge of the harassment. Plaintiff asserts claims for hostile work environment based on sex and retaliation under Title VII of the Civil Rights Act of 1964, as amended, as well as claims for negligent supervision and negligent retention under North Carolina law.

## JURISDICTION, VENUE, AND PARTIES

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for relief asserted herein arise under federal law, and pursuant to 28 U.S.C. § 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights. This Court also has original subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1332 on the basis of diversity jurisdiction as the Plaintiffs is a resident of North Carolina, and the Defendant is a foreign corporation, incorporated in the District of Columbia with its principle corporate headquarters located at 17517-B Indian Head Hwy, Accokeek, Maryland 20607.

2.     The Court has original jurisdiction over Ms. Burrell's state law claims pursuant to 28 U.S.C. § 1332.  This Court also has supplemental jurisdiction over Ms. Burrell's related state law claims pursuant to 28 U.S.C. § 1367(a) to the extent jurisdiction is based upon 28 U.S. C. § 1331 and 28 U.S.C. § 1343(a)(4) because the state law claims arise from the same facts, transactions and/or occurrences as the claims within the Court's original jurisdiction and form part of the same case or controversy under Article III of the United States Constitution.

3.     Although the Defendant referred to itself within its Position Statement in Response to EEOC Charge of Discrimination as "Adventure Tours, LLC (d/b/a Adventure by Dawn NC)" none of these entities appear to exist by these names.  There is no corporation legally doing business in North Carolina as Adventure Tours, LLC nor one doing business as "Adventure by Dawn NC."  Rather, Defendant's true identity is a foreign business entity organized in the District of Columbia registered under the name "Adventures by Dawn LLC," with its headquarters located at 17517-B Indian Head Hwy, Accokeek, MD 20607.  "Adventures by Dawn LLC" is registered as a foreign corporation with the North Carolina Secretary of State and is currently active.  Its North Carolina registered agent is an individual residing in North Carolina and Ms. Burrell's paystubs reflect her employer as "Adventure by Dawn LLC, 17517B Indian Head Hwy, Accokeek, MD 20607."  Hereinafter, Defendant will be referred to as "Adventure Tours" and/or Defendant.

2

4. At all relevant times, Defendant employed 15 or more employees and otherwise constituted an "employer" engaged in an industry affecting commerce pursuant to 42 U.S.C. § 2000e et seq.

5. This Court has personal jurisdiction over the Defendant because it hires and employs individuals who reside in North Carolina, pays wages to North Carolina employees into North Carolina's stream of commerce, operates motor carriers/buses/transportation vehicles over North Carolina State roadways, advertises its services as available from its offices in Charlotte, North Carolina located at 11201 Moores Chapel Road, Charlotte, NC 28214-3015 and stated within its response to the EEOC that the Plaintiff is "employed as a Motorcoach Operator in the Charlotte, North Carolina division." Accordingly, Defendant has availed itself to sue and be sued in the State of North Carolina as personal jurisdiction exists within this State.

6. Plaintiff Nashaun Burrell is a citizen and resident of Mecklenburg County and is an African American female who was hired by Defendant on or about December 29, 2023, and is currently employed by Defendant as a motor coach operator.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff Nashaun Burrell filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on August 6, 2025, alleging including but not limited to claims of sexual harassment, hostile work environment, and retaliation against Defendant.

9. On April 17, 2026, Ms. Burrell received a Notice of Right to Sue from the EEOC.

3

10. Plaintiff before bringing this action has fulfilled all conditions precedent to the institution of this lawsuit by exhausting her administrative remedies.

## FACTUAL ALLEGATIONS

11. Defendant hired Ms. Burrell as a motor coach operator on or about December 29, 2023.

12. As a motor coach operator for Defendant, Ms. Burrell operated Defendant's motor coaches and passenger vans, transporting school groups and other customers on charter trips throughout North Carolina and neighboring states. These assignments frequently lasted several days, required overnight travel, and required Ms. Burrell to work in close proximity with other Adventure Tours' drivers assigned to the same trips.

13. During the events alleged herein John Robinson (African American male) was also employed by Defendant as a motor coach operator and regularly worked with Ms. Burrell on multi-day charter trips. Beginning in approximately March 2025, Robinson began directing unwelcome sexual attention toward Ms. Burrell.

14. On or about March 18 through March 21, 2025, Plaintiff and Robinson were assigned to work together on a multi-day Adventure Tours charter transporting elementary school students, teachers, and parents through southeastern Virginia, including Williamsburg and Petersburg, Virginia ("Williamsburg Charter Trip").

**Tuesday, March 18, 2025**

15. On March 18, 2025, Robinson called Ms. Burrell under the guise of discussing their work assignment. Robinson quickly shifted the conversation away from work to personal questions about Ms. Burrell's marital status and whether she wanted to have children. He also told Ms. Burrell that she "owed" him a "two-to-five-minute hug" because his birthday had recently

4

passed. He also said he wanted a son for his birthday and asked her if she would have it for him. Ms. Burrell ignored Robinson and did not encourage Robinson's advances. Instead, she ended the conversation and advised Robinson that she needed to prepare for work the following day.

16. Ms. Burrell reasonably believed Robinson's requests, questions, and comments were inappropriate, unwelcome, and unrelated to any legitimate business purpose but were made for his own purposes of attempting to begin a romantic and/or sexual relationship with Ms. Burrell.

**Wednesday, March 19, 2025**

17. The following day, March 19, 2025, Robinson repeatedly attempted to contact Ms. Burrell by telephone and FaceTime throughout the workday while the parties were transporting students on the Williamsburg Charter trip. Robinson's repeated calls were unrelated to the performance of Ms. Burrell's job duties and continued despite Ms. Burrell's attempts to ignore his calls, his questions, and his comments.

18. Later that day, while the tour buses were aboard the Jamestown-Scotland Ferry, Ms. Burrell remained on her assigned bus for the specific purpose of avoiding Johnson. However, when Ms. Burrell did not exit her bus, Robinson boarded Ms. Burrell's bus without invitation.

19. While Ms. Burrell was seated in the bus driver seat, Robinson stood extremely close to Ms. Burrell. Johnson positioned himself so that his back was toward Ms. Burrell, blocking her ability to freely move within the driver's area. He remained in Ms. Burrell's personal space under the pretense of asking inconsequential work-related questions.

20. After tolerating Robinson's unreasonably close proximity to her, Ms. Burrell then told Robinson to move because she did not want him standing against her in such close proximity, and Robinson then exited Ms. Burrell's bus.

5

21. This incident was witnessed by at least one teacher traveling on the tour, Jamie Worth, who thereafter asked Ms. Burrell if she was okay.

22. That afternoon, Ms. Burrell sent several texts to Operations Manager Courtney Brown informing him of Robinson's conduct. After receiving no response, she texted, "don't ignore me sir," to which Brown finally responded two hours later. Brown called Ms. Burrell and she informed him she was having issues with her coworker Johnson. Brown stated "Oh God! What did he do now? I need a reason to get rid of him." Ms. Burrell then informed Brown of Johnson's unwelcome and inappropriate conduct thus far on the Williamsburg Charter Trip.

23. Later that same day, Robinson continued communicating with Ms. Burrell by text message. During those communications, Robinson stated that he hoped Ms. Burrell would not be "on the phone tonight" because otherwise he would have to "watch TV," in an attempt to initiate a personal relationship with Ms. Burrell outside of work. Ms. Burrell ceased responding to Robinson's messages.

24. Robinson nevertheless continued pursuing Ms. Burrell. After Robinson, again, approached Ms. Burrell's bus later that afternoon, Ms. Burrell became sufficiently concerned for her safety and well-being that she activated the video recording function on her cellular telephone before Robinson boarded the bus in an effort to protect herself from him.

25. During the recorded interaction, Robinson immediately resumed discussing the "hug" he believed Ms. Burrell owed him. Ms. Burrell questioned why Robinson continued pursuing physical contact after she had not reciprocated his advances. Ms. Burrell expressly instructed Robinson to "get the hell off my bus" and directed him to leave.

26. Rather than respecting Ms. Burrell's rejection, Robinson suggested that "like roaches," he would return. Robinson further told Ms. Burrell that he hoped she would contact him

6

later that evening between approximately 8:00 p.m. and 10:00 p.m., stating that all she needed to do was ask him, "Where you at?" Ms. Burrell responded, "Don't hold your breath."

27. Robinson nevertheless persisted, telling Ms. Burrell that he "really liked" her, that he could not talk to anyone else the way he talked to Ms. Burrell, and further stated that "whatever transpires between me and you as a friendship or more or less" would continue because he insisted that Ms. Burrell liked him.

28. Ms. Burrell never indicated she liked Johnson and never indicated verbally or nonverbally that Robinson's advances were welcome in any manner. To the contrary, Ms. Burrell repeatedly rejected Robinson's advances verbally, physically distanced herself from him, ceased responding to his communications, and instructed him to leave her alone.

29. Shortly thereafter, Ms. Burrell again communicated Robinson's conduct to Operations Manager Courtney Brown. During that conversation, Ms. Burrell informed Brown about Robinson's repeated requests for physical affection, his invasion of her personal space, and his continued unwanted pursuit of Ms. Burrell.

30. Brown responded seemingly annoyed, stating that Ms. Burrell should prepare a written statement and represented that he would provide the necessary paperwork. Brown never provided Ms. Burrell with the promised reporting paperwork.

31. Later that evening, Robinson again texted Ms. Burrell asking whether she was "on the phone," consistent with his earlier statements that he expected Ms. Burrell to contact him privately that evening. Ms. Burrell did not respond to him.

**Thursday, March 20, 2025**

32. On March 20, 2025, Robinson, again, repeatedly attempted to contact Ms. Burrell by telephone, FaceTime, and text message.

33. Although Ms. Burrell attempted to redirect communications toward work-related matters, Robinson repeatedly steered conversations toward personal subjects and attempted to persuade Ms. Burrell to leave her hotel room during downtime between assignments.

34. In an effort to limit Robinson's direct communications, Ms. Burrell created a group text message, which included another Adventure Tours employee. Robinson nevertheless continued sending Ms. Burrell direct communications rather than limiting his communications to legitimate work matters or the group text Ms. Burrell had created.

35. Ms. Burrell forwarded Courtney Brown screenshots of Robinson's attempts to call and Facetime her. She also informed Brown of Ms. Worth's complaints of Robinson's inappropriate behavior toward another teacher who was on the trip who expressed that Robinson's conduct made her uncomfortable.

**Friday, March 21, 2025**

36. On March 21, 2025, while Ms. Burrell was obtaining breakfast at the hotel before beginning work, Robinson approached Ms. Burrell. After Ms. Burrell commented that Robinson appeared tired and asked if he had got enough sleep the night before. In response, Robinson smiled, looked downward toward Ms. Burrell's genital area, nodded in that direction, and implied that Ms. Burrell herself was the "medicine" he needed. Ms. Burrell immediately distanced herself from Robinson because she found the conduct sexually suggestive, humiliating, and offensive.

37. Later that same day, 5th grade teacher Jamie Worth who was a customer on the tour, informed Ms. Burrell that Robinson had behaved in a similarly inappropriate manner toward another female teacher participating in the trip by invading her personal space and making her uncomfortable.

8

38. Ms. Worth requested Defendant's contact information in order to report Robinson's conduct herself to Defendant and, she did in fact that day report Robinson's conduct to Defendant. Specifically, Ms. Worth complained to Defendant that Johnson was "highly inappropriate" and "harassing women" while on the trip. She also corroborated Ms. Burrell's account of Johnson standing extremely close to Ms. Burrell while she was seated in the driver seat of her bus. Ms. Worth further requested that for any future trips with Defendant she would requires an all-female crew "for the safety of my teachers, parents, and students."

39. Throughout the trip, Ms. Burrell intentionally attempted to remain around other employees or tour participants to avoid Robinson because she feared being alone with Robinson.

40. Ms. Burrell also confided in co-worker Arron Crowder regarding Robinson's conduct and became so distressed that she burst into tears while discussing the situation with him.

41. Despite Ms. Burrell's earlier report to management, and the assurance from Brown that she would not be required to work with Johnson again, Defendant permitted Robinson to continue working in close proximity to Ms. Burrell.

**<u>After the Williamsburg Charter Trip</u>**

42. After she returned from the Williamsburg Charter Trip, Ms. Burrell received no communications from Defendant or Defendant's human resources office about her harassment complaint or whether any investigation had occurred and/or concluded. Because Brown had previously promised her she would not have to work with Robinson and assured her that he had spoken to Robinson directly about his behavior, Ms. Burrell believed that Defendant was taking the necessary steps to stop Robinson's sexual harassment of her. She was mistaken.

9

**May 8, 2025**

43. Even though Defendant had represented that Ms. Burrell would not be forced to work with Johnson again, this was untrue. On May 8, 2025, Ms. Burrell encountered Robinson again at Defendant's Charlotte bus yard.

44. Ms. Burrell became upset when she saw Robinson because she thought he might harm or retaliate against her for complaining to Defendant about his unwanted perverted conduct. She was so concerned by Robinson's presence that she began video recording on her cellular telephone before approaching her assigned bus because she really did not know what he would say or do.

45. Once Ms. Burrell ceased recording, Robinson immediately looked toward Ms. Burrell, blew her a kiss, and winked at her. Ms. Burrell reasonably perceived Robinson's conduct as yet another unwelcome sexual advance.

46. Shortly thereafter, Ms. Burrell was involved in a minor accident while beginning her assigned route and believed that her anxiety and nervousness arising from Robinson's conduct contributed to the incident.

47. Later that same day, Ms. Burrell unexpectedly encountered Robinson again while assigned to the Old Salem Museum. Ms. Burrell immediately contacted Courtney Brown and advised him that Robinson was present, that she was uncomfortable, and that she felt unsafe.

48. Robinson eventually departed the location, reducing Ms. Burrell's immediate concern. However, that same date, Ms. Burrell reached out to Vice President Terrence Dyson, Jr. directly to complain of Robinson because having seen Robinson at the bus yard and then on assignment in Winson-Salem, she then believed that Defendant was not doing anything to keep

Robinson from working near her and she hoped that contacting someone higher up in the company would help.

49.   Dyson instructed Ms. Burrell to fill out an incident report form, informing her that he would have someone from human resources send her the appropriate form. Ms. Burrell completed the incident form as she was instructed and submitted it to Defendant's human resources department.

50.   Ms. Burrell first heard from Defendant's human resources department shortly after she reached out to Dyson.

51.   After Ms. Burrell submitted her written statement, she began experiencing issues with Defendant that she had not experienced prior to her complaints about Robinson.

52.   Ms. Burrell began experiencing issues with her schedule including Defendant leaving her off the work schedule, which as an hourly employee meant she did not get paid. She also began experiencing issues with her pay, including submitting hours she worked but not being paid on Defendant's payroll date and also receiving the incorrect amounts.

53.   Plaintiff reasonably believed her work schedule and payroll issues were inconsistent with the treatment she had received from Defendant before reporting Robinson's inappropriate conduct because these issues had not occurred prior to that time, and thus, were causally connected to her reporting Johnson.

54.   Defendant had actual knowledge of Robinson's repeated unwelcome conduct toward Ms. Burrell through Ms. Burrell's verbal complaints, text communications, formal written complaint, and the reports of other witnesses.

55.   Despite receiving notice of Robinson's conduct, Defendant failed to take prompt and effective action reasonably calculated to end the harassment.

11

**May 26, 2025**

56. On or about May 26, 2025, Ms. Burrell again encountered Robinson at another work location despite Defendant's earlier assurances that the two employees would not be required to work together or around one another.

57. During that encounter, Robinson repeatedly walked past Ms. Burrell's assigned bus while looking for her inside the bus. Plaintiff attempted to record Robinson's conduct because she believed Defendant continued to carelessly schedule Robinson in close proximity to her despite knowing of her complaints.

58. In late June 2025, Defendant conducted a company meeting for drivers and other employees at its Charlotte facility. Although Defendant addressed certain payroll and communication issues during the meeting, Defendant did not address Plaintiff's sexual harassment complaints or the measures being taken to protect Plaintiff from further harassment.

59. Following the meeting, Vice President Terrance Dyson, Jr. requested a private, one-on-one lunch meeting with Plaintiff, which Plaintiff agreed to attend.

60. On or about July 2, 2025, Plaintiff met privately with Dyson for the one-on-one lunch meeting, and they discussed in detail the sexual harassment she had experienced and Defendant's response, if any, to her complaints.

61. During that meeting, Dyson asked Plaintiff why she had not previously informed him about Robinson's conduct. Plaintiff reminded Dyson that she had previously communicated with him regarding the harassment, including through text messages following telephone conversations concerning Robinson's conduct and Defendant's scheduling practices.

62. During the same meeting, Dyson, acting on behalf of Defendant, offered Plaintiff $5,000.00 in exchange for "calling off" the EEOC and her lawyer, asking her to dismiss her

pending EEOC Charge and fire her attorney who had assisted her with filing the Charge. Ms. Burrell was shocked by his offer, did not know what to say but responded that she would have to check her signed agreement with her attorney.

63. The very next day, Dyson communicated with Ms. Burrell following up with her regarding whether she had reviewed her attorney contract, implying that he continued to want Ms. Burrell to accept $5000 from Defendant in exchange for her withdrawing her EEOC charge and firing her attorney.

64. Upon information and belief, Defendant fired Robinson on June 17, 2025, however, Defendant's delay and failure to promptly address Ms. Burrell's complaints of Robinson's unwelcome conduct caused her to go on work assignments fearing that she would see Robinson, did in fact see Robinson, and he continued to harass her by blowing her a kiss, winking at her, and walking near her bus and looking inside for her, and thus, Defendant perpetuated the hostile work environment that Robinson had created due to Ms. Burrell's sex.

65. At all times relevant herein, Plaintiff remained employed by Defendant and continued performing her job duties despite Defendant's failure to take prompt and effective action reasonably calculated to end the harassment and prevent further contact between Plaintiff and Robinson.

66. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic and non-economic damages including but not limited to lost wages and personal injuries such as anxiety, emotional distress, humiliation, embarrassment, mental anguish, fear while performing her job duties, and interference with the terms, conditions, and privileges of her employment.

67. Plaintiff realleges all preceding paragraphs and incorporates each by reference as if fully set forth herein.

68. The harassment that Plaintiff experienced was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an objectively and subjectively hostile and abusive working environment. Specifically, Robinson repeatedly made unwelcome sexual advances toward Plaintiff; repeatedly requested physical affection after Plaintiff rejected his advances; repeatedly telephoned, FaceTimed, texted, and otherwise attempted to communicate with Plaintiff for personal, rather than work-related, reasons; invaded Plaintiff's personal space by boarding her bus, standing so closely to her that she was effectively blocked within the driver's compartment, and refusing to leave until directed to do so; made sexually suggestive comments and gestures, including implying that Plaintiff's genital area was the "medicine" he needed; told Plaintiff he hoped she would contact him privately at night; insisted that Plaintiff liked him despite her repeated rejection of his advances; and continued pursuing Plaintiff even after she expressly told him to leave her alone and after Defendant had actual notice of his conduct.

69. Robinson's conduct caused Plaintiff to fear being alone with him. As a result of Robinson's conduct and the fear of being alone that he instilled in her, Plaintiff altered the manner in which she performed her job by remaining in the presence of coworkers and other witnesses whenever possible; recorded encounters with Robinson to protect herself; experienced significant anxiety and emotional distress while performing her job duties and reported to management that she felt uncomfortable and unsafe in Robinson's presence.

70. Defendant knew or should have known of Robinson's sexually harassing conduct because Plaintiff repeatedly complained to management, including complaining to Operations

Manager Courtney Brown and Vice President Terrance Dyson, Jr., informing management that she felt uncomfortable and unsafe, submitted a formal written sexual harassment complaint, and other witnesses observed Robinson's inappropriate conduct and sought to report it and did, in fact report it. Despite this actual notice, Defendant failed to take prompt and effective remedial action reasonably calculated to end the harassment, allowing Robinson continued access to Plaintiff and permitting the hostile work environment based on sex to continue.

71. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic and non-economic damages including but not limited to lost wages and personal injuries such as anxiety, emotional distress, humiliation, embarrassment, mental anguish, fear while performing her job duties, and interference with the terms, conditions, and privileges of her employment.

## RETALIATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e-3(a))

72. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

73. Plaintiff engaged in protected activity under Title VII by opposing what she reasonably believed to be unlawful sexual harassment and discrimination in the workplace.

74. Plaintiff engaged in protected activity by, among other things:

a. Reporting Robinson's sexually harassing conduct to her supervisor, Courtney Brown, during the Williamsburg Charter Trip;

b. Reporting Robinson's conduct to Defendant's Vice President, Terrance Dyson, Jr.;

c. Submitting Defendant's written sexual harassment complaint form;

15

d. Continuing to complain to Defendant's management regarding Robinson's conduct and Defendant's failure to adequately address it; and

e. Filing a Charge of Discrimination with the Equal Employment Opportunity Commission.

75. Defendant had actual knowledge of Plaintiff's protected activities.

76. Following Plaintiff's protected activities, Defendant subjected Plaintiff to adverse actions because she opposed Defendant's unlawful employment practices.

77. Among other things, Defendant failed to timely communicate Plaintiff's work assignments; did not include her on the work assignment schedule; subjected Plaintiff to payroll problems; failed to timely respond to Plaintiff's repeated complaints regarding work scheduling; omitted Ms. Burrell completely from the work assignment schedule; repeatedly scheduled Plaintiff to work in close proximity to Robinson after assuring Plaintiff that the two employees would no longer be required to work together; delayed providing Plaintiff with Defendant's formal sexual harassment complaint procedures, and otherwise failed to take prompt and effective corrective action after Plaintiff engaged in protected activity.

78. Defendant's actions occurred shortly after Plaintiff engaged in protected activity and continued thereafter.

79. The temporal proximity between Plaintiff's protected activity and Defendant's adverse actions, together with Defendant's knowledge of Plaintiff's complaints and Defendant's repeated failure to honor its assurances that Plaintiff would not be required to work around Robinson, support a reasonable inference that Defendant's actions were taken because Plaintiff engaged in protected activity protected by Title VII.

16

80.   Defendant's such retaliatory conduct would dissuade a reasonable employee from opposing unlawful discrimination or participating in protected activity under Title VII.

81.   As a direct and foreseeable result of Defendant's retaliatory conduct, Plaintiff has suffered economic and non-economic damages including but not limited to lost wages, emotional distress, humiliation, embarrassment, mental anguish, inconvenience, and other compensatory damages.

## **NEGLIGENT SUPERVISION**

82.   Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

83.   At all times relevant herein, Defendant Adventure Tours employed John Robinson as a motor coach operator.

84.   Defendant owed Plaintiff a duty to exercise reasonable care in supervising Robinson while he was acting within the course and scope of his employment and while working in the presence of Plaintiff and other employees.

85.   Beginning no later than March 19, 2025, Defendant had actual knowledge that Robinson had engaged in repeated unwelcome sexually harassing conduct toward Plaintiff.

86.   On March 19, 2025, Plaintiff reported Robinson's conduct to her supervisor, Courtney Brown, including Robinson's repeated requests for physical affection, repeated unwanted communications, invasion of Plaintiff's personal space, and other unwelcome sexually harassing conduct.

87.   During that conversation, Brown acknowledged Plaintiff's complaints, instructed Plaintiff to prepare a written statement, and represented that Defendant would provide the necessary reporting paperwork.

17

88. Subsequently, Plaintiff also reported Robinson's conduct to Defendant's Vice President, Terrance Dyson, Jr.

89. Defendant thereafter received Plaintiff's formal written sexual harassment complaint describing Robinson's conduct in detail.

90. Defendant also knew because Ms. Burrell informed Defendant, or reasonably should have known, that Robinson's conduct had been observed by other individuals, including employees and customers who witnessed Robinson's inappropriate behavior toward Plaintiff.

91. Despite receiving actual notice of Robinson's conduct from Ms. Burrell as well as customers like Ms. Worth during the Williamsburg Trip, Defendant failed to exercise reasonable care in supervising Robinson.

92. Among other things, Defendant failed to promptly investigate Plaintiff's complaints; failed to timely implement appropriate corrective action; failed to adequately supervise Robinson's interactions with Plaintiff; failed to ensure that Robinson refrained from further personal contact with Plaintiff; failed to adequately monitor Robinson's conduct following Plaintiff's complaints; and failed to implement effective measures reasonably calculated to prevent Robinson from continuing to have unnecessary contact with Plaintiff.

93. Although Defendant advised Plaintiff that she would not be required to work with or around Robinson, Defendant nevertheless continued assigning Plaintiff and Robinson to work in close proximity after receiving Plaintiff's complaints.

94. Following Plaintiff's complaints, Defendant repeatedly scheduled Plaintiff and Robinson on buses parked immediately adjacent to one another at Defendant's Charlotte facility and permitted Robinson to be present at work locations where Plaintiff was assigned, resulting in

18

additional encounters between Robinson and Plaintiff, such as the instance that occurred at the Salem museum.

95. Defendant knew or reasonably should have known that continuing to place Robinson in close proximity to Plaintiff created a foreseeable risk that Robinson would continue engaging in unwelcome conduct toward Plaintiff and would further exacerbate Plaintiff's emotional distress and fear in the workplace.

96. Defendant's failure to adequately supervise Robinson was a proximate cause of Plaintiff's continued exposure to Robinson following her complaints, the continuation of the hostile work environment, and Plaintiff's resulting injuries.

97. As a direct and proximate result of Defendant's negligent supervision, Plaintiff suffered economic and non-economic damages including but not limited to emotional distress, humiliation, embarrassment, anxiety, fear while performing her job duties, mental anguish, inconvenience, and other compensatory damages in an amount to be determined by the jury.

## NEGLIGENT RETENTION

98. Plaintiff realleges all preceding paragraphs and incorporates by reference each as though fully set forth herein.

99. At all times relevant herein, Defendant Adventure Tours employed John Robinson as a motor coach operator.

100. Defendant owed Plaintiff a duty to exercise reasonable care in retaining employees whom Defendant knew, or in the exercise of reasonable care should have known, were likely to engage in conduct that posed an unreasonable risk of harm to other employees.

101. Beginning no later than March 19, 2025, Defendant acquired actual knowledge that Robinson had engaged in repeated unwelcome sexually harassing conduct toward Plaintiff,

19

including repeated unwanted sexual advances, repeated requests for physical affection, repeated unwelcome personal communications, sexually suggestive comments and gestures, and repeated invasions of Plaintiff's personal space.

102. Plaintiff promptly reported Robinson's conduct to Defendant's management, including supervisor Courtney Brown and Vice President Terrance Dyson, Jr.

103. Defendant thereafter received Plaintiff's formal written sexual harassment complaint documenting Robinson's conduct in detail.

104. Defendant also knew, or reasonably should have known, that Robinson's conduct had been observed by third-party witnesses, including employees and non-employees/customers, and that at least one additional individual sought to report, and did in fact report, Robinson's inappropriate conduct to Defendant.

105. Despite possessing actual knowledge of Robinson's conduct and the foreseeable risk that Robinson posed to Plaintiff, Defendant elected to continue Robinson's employment.

106. Rather than promptly removing Robinson from the workplace, suspending him, terminating his employment, or otherwise preventing further contact between Robinson and Plaintiff, Defendant continued to retain Robinson and permitted him to remain in the workplace for approximately three months after receiving Plaintiff's initial complaint.

107. During that period, Defendant continued assigning Plaintiff and Robinson to work in close proximity despite previously representing to Plaintiff that the two employees would no longer be required to work together or around one another.

108. As a direct consequence of Defendant's decision to retain Robinson after acquiring actual knowledge of his conduct, Plaintiff was repeatedly exposed to additional unwanted

encounters with Robinson, including encounters at Defendant's Charlotte bus facility and at work assignments after Plaintiff had reported Robinson's harassment.

109. Defendant knew, or in the exercise of reasonable care should have known, that retaining Robinson under these circumstances created an unreasonable and foreseeable risk that Plaintiff would continue to be subjected to Robinson's unwelcome conduct and would suffer additional emotional distress and other injuries.

110. Defendant ultimately terminated Robinson's employment in approximately June 2025. However, Defendant retained Robinson for months after receiving actual notice of Plaintiff's complaints, during which time Plaintiff continued to encounter Robinson in the workplace and continued to suffer harm as a result of Defendant's decision to retain him.

111. Defendant's negligent retention of Robinson was a proximate cause of Plaintiff's injuries and damages.

112. As a direct and proximate result of Defendant's negligent retention of Robinson, Plaintiff has suffered economic and non-economic damages including not limited to emotional distress, humiliation, embarrassment, anxiety, mental anguish, fear while performing her job duties, inconvenience, and other compensatory damages in an amount to be determined by the jury.

**WHEREFORE**, Plaintiff Nashaun Burrell respectfully requests that this Court enter judgment in her favor and against Defendant Adventure Tours and grant the following relief:

1. Declare that Defendant violated Title VII of the Civil Rights Act of 1964, as amended;

21

2.　　Award Plaintiff all compensatory damages available under Title VII and North Carolina law, including but not limited to lost wages, lost employment benefits, emotional distress, humiliation, embarrassment, mental anguish, inconvenience, and other non-economic damages;

3.　　Award Plaintiff punitive damages as authorized by Title VII and North Carolina law;

4.　　Award Plaintiff all equitable relief authorized by Title VII, including such relief as is necessary to make Plaintiff whole;

5.　　Enjoin Defendant from engaging in future acts of unlawful discrimination, sexual harassment, retaliation, and other employment practices prohibited by Title VII, and require Defendant to implement and maintain policies, practices, training, and complaint procedures reasonably designed to prevent and promptly correct unlawful workplace harassment and retaliation;

6.　　Award Plaintiff her reasonable attorneys' fees, expert witness fees, litigation expenses, and costs pursuant to 42 U.S.C. § 2000e-5(k) and any other applicable provision of law;

7.　　Award pre-judgment and post-judgment interest as allowed by law;

8.　　Tax the costs of this action against Defendant; and

9.　　Grant such other and further legal or equitable relief as the Court deems just and proper.

Respectfully submitted, this the 17th day of July, 2026.

**GREEN MISTRETTA LAW, PLLC**

/s/ Dawn T. Mistretta
Dawn T. Mistretta, N.C. State Bar No. 31691
Stanley B. Green, N.C. State Bar No. 25539
1752 Heritage Center Drive, Suite 101
Wake Forest, North Carolina 27587

22

Telephone: (919) 278-7453
Facsimile: (855) 876-8893
dmistretta@gmlawyers.org
sgreen@gmlawyers.org
*Counsel for Plaintiff*

23